I'm Ben Nutley here representing Appellant Lynch. I'd like to, I think, reserve most of my time, 15 minutes, for rebuttal, I think, unless the court has more extensive questions than that. And I would take my time now to speak a little bit about, again, unless the court has overriding questions, I'd like to speak a little bit about the claims rate and the reporting of the claims rate, which is an issue that we talk about. I have a question for you. By all means. It's a practical question. This was settled for what, around a quarter of a billion dollars, right? Well, no. I couldn't agree to that. That's something that is somewhat an issue. That's what the court concluded, that the potential value of the settlement was if every class member who claimed was eligible, in the sense that they met the criteria that were set out in the claim form and in the settlement for a claim to be valid, which included questions about their state of mind and whether they knew about the fee and whether it would have mattered to them when it was imposed. So, I could not possibly... The reason I asked you the question was because I've had some experience distributing money in these class action matters. And especially when you've got that pot there and the gain to each individual is like $7, huh? Who's going to bother with that? There could be a lot of money just left in this fund. But you say it's just kind of a disappearing thing. That's... Say 7 million people show up for their money, so you've got $49 million. And then you get your fee. What happens to the rest of the money? Is it kept by AT&T? That's correct. There is really no pot here or a fund per se. This is a claims-made settlement, so that AT&T pays only the number of valid claims that there are, if that's 7,000 or 7 million. Have the claims been received and given out? I do not believe they have been distributed because the effective date of the settlement doesn't occur until after all of... But they've been received. The deadline's passed. Correct. So if anybody wanted to know how many claims there were, we could find out. That is true. I believe. But somebody did some computation to get to that big number. Well, there is some evidence, isn't there? There is. There is evidence that there are something like 35 million class members. There is some dispute about whether that's entirely accurate, but let's assume, for the sake of argument, that it's fairly accurate. So the calculation is pretty simple. They took the $7 and multiplied it by the 35 million and came up with the potential value of the settlement. No, no, but what I'm saying is there's some evidence as to how many are likely to receive the claims. There's a survey offered by your opponents. That's correct. That is a subject of a motion for judicial notice. It was not before, which we've opposed, it was not before the district court. She had not seen that evidence, so there was no evidence, no such evidence before the district court. Admittedly, it could potentially be in front of the district court on remand. We've objected to its production here mainly because it wasn't on the record. We haven't made evidentiary objections to it. There is no other evidence from either side than as to what the likelihood of anyone, anyone or all possible claimants. Not that I'm aware of. But what is, I mean, in terms of, I mean, there are two reasons this could matter. The fact that it's a claims made judgment, as I understand it. One is that somehow the class should have gotten more in the settlement. Each person should have gotten more money, which seems fairly hard to substantiate. Yeah, I don't believe we've really hooked our hat to that. And then the second is that there was some undue difficulty in the manner in which the claims were to be made. And certainly, I mean, compared to other claims made judgments, this seemed like a piece of cake. You have to fill out a piece of paper, check. You didn't have to put any receipts in. You didn't have to put any statements in. You didn't have to. All you had to do was check some boxes, right? That's correct. The verification of who the person was and whether they were entitled to claim in general could be made. Didn't need receipts. Or any individualized statements or anything. Correct. And the statements that had to be made was, I didn't notice this, and it would have mattered. It doesn't even say what would have mattered meant. I mean, I would have thought twice would have been sufficient. So pretty much anybody who actually wants the money is going to send it out. And no one's going to be found to have perjured themselves by saying that they didn't see it and they, in fact, didn't matter. As a practical matter, they're not going to start a task force to identify people who wrongly stated their claim of lying. I'm saying that unless you think that more people actually noticed this, and, in fact, it seems very likely that very few people did notice it. And as to the second statement, i.e., it would have mattered, it's a completely innocuous statement, so it couldn't possibly. Innocuous, but it really has no place in the claim form for the reasons we described. I think it is, and I don't think it's innocuous in the sense that if somebody doesn't understand that, they may say, I don't understand this well enough to aver this under penalty of perjury. Sure, we're not all lawyers and not everybody thinks three times before signing off on something that says, I signed this under penalty of perjury. I don't know what the average person does. I know when I see that in a document, I think three times. Is this true? Is there some interpretation of this that if I'm misinterpreting this, is there some interpretation of this that makes it untrue? So what they should have done is just give everybody $7? Not just necessarily cut checks for $7. And if they were going to do that, I assume that AT&T would have not agreed to a $7 award. I couldn't presume to say, no, they should have. And then the third possibility is that this has something to do with the amount of fees. Yes, this has something to do with both the amount of fees. Is that your principal concern? It's the principal.  And it is also of concern intrinsically that it's a rather high fee in relation to what was likely to have been accomplished. But our technical view of it is there just isn't enough information. They didn't put in the records necessary to – we barely know what – The settlement was negotiated first and then the fees after the settlement was agreed on. That's correct. Well, if they'd been negotiated together, there would have been an objection that the pool is lower because of the settlement. That's true. So now you do it afterwards. Had they been done together, that would be the objection. That is correct. And so what's the objection when they do it afterwards? Well, the objection when they do it after has to do with – there are cases since – for example, I think Staten v. Boeing is one of them. I know that Bluetooth is one of them where the party said, we negotiated these separately. And yet this court said, no, we're not going to take that kind of self-serving characterization of the process as necessarily foreclosing collusion. But in this instance, these were, unlike in Staten and I believe unlike in Bluetooth, were lodestar fees. And they were lodestar fees for many, many years of litigation in three or four different courts by several different law firms. And yet how much of that work over those courses in those various fora that are far-flung fora, how much of that was reasonably necessary to the result that was obtained here? We have no way of knowing, partly because of the record. Well, it's a pretty fair judgment in which the district court made that AT&T's willingness to settle had something to do with the fact that they've been litigating for many years in many fora and wanted it all over with. Oh, I'm sure that's true. And yet that alone, the district court's observation alone, isn't enough to satisfy the burden necessary for review, for example. We know what the district court said. The question was, was there some support? The case law specifically says that you don't need to have the billing records in a class settlement, right? If your fee is justified solely on a lodestar basis, my understanding is you have to have more than was provided here. I don't think you necessarily have to have detailed billing records as a day-by-day matter. I know the courts vary on that. But my understanding is where the fee is justified purely on a lodestar basis, there needs to be documentation that would say That was said as lately as Bluetooth. But in Bluetooth, the problem was there was no, my understanding was the $800,000 was just out of the sky. That's correct. This case isn't like Bluetooth in that regard. You know, this is a case that is not like every other. So I want to know what case you have that says that if you have, I mean, what we have here is a statement from the lawyers that these are the number of hours that each person spent and that these are our costs, which were laid out in detail. And if the judge wants to look at the actual records, we're willing to provide them. So what's the problem? What case says that's not good enough? Well, I'd say two things about that. One, I think the cases we've been discussing, I think Statton says it and I think But Statton was a percentage fee. It wasn't a lodestar fee. Well, my understanding of that case is that it was a hybrid. They justified the fee sort of as a hybrid, didn't they, as it was partly as a part. And the percentage was an enormous percentage of a made-up fund that didn't even have money in it. Correct. Here we have, even if one assumes, I mean, I started doing these numbers in my head. Let's suppose that the actual amount of the fund is off by a factor of 10. Right. The 2.5% is still by our common fund jurisprudence less than the benchmark number. That's correct. And you and I can sit here and toss back numbers like that all day long and come up with, okay, this number isn't right. It wouldn't be fair if it were 1%. It would be fair if it were 50%. I'm sorry, I don't understand. You're not responsive to what I'm saying. I'm sorry. You're saying, well, their number of what this fund is is much too high because, in fact, the claims are not going to be anywhere near what they're saying it is, right? I think it's much too high, but I don't know. This is still an amount as compared to the fund that's less than the usual 25% benchmark. I think if it's off by a factor of 10. Slightly above. Right, correct. And so what I mean is this. We can speculate as, well, maybe it's a factor of 10. What if it's off by a factor of 100? What if it's off by a factor of 1? We don't really know. We can sit here and speculate as to and sort of say, well, that would be fair. We're not planning anyway because we're using lodestar fees. Correct. That's right. So I don't understand your argument. What I don't understand is if there's a basis for this lawsuit, if these fees were charged to people illegally, that's what you're contending, right? No, no, Your Honor. Well, that's what the complaint contends, that they were misdescribed. That's right. We objected to the settlement, so we're not the proponents of the complaint. We're absent class members saying that we don't think the settlement. You're actually our one absent class member. Correct. Right. I don't mean to increase myself. If that's all, I'll save the rest for rebuttal. And what is your name? My name is Ben Nutley. It's C. Benjamin Nutley on your list. Oh, you're way at the bottom. Yeah. Such is my faith. I was looking at, yeah, I guess I should have figured that out because these guys in the front row were all nodding. You mean glaring at me, right? Yes. But wait here too. That's right. They were nodding. Okay. All right. Very good. I'll save the rest then. Thank you. Okay. Fine. All right. Who do you represent? Good morning. May it please the Court. My name is Stephen Rice, and I represent the AT&T defendants. I'm going to spend about 12 minutes of the allotted time talking about settlement approval issues only, not the approval issues. Then Dan Johnson, counsel for the Randolph and Schnell plaintiffs, will talk for about five minutes. And then finally, with whatever remaining time is available, J. Paul Janak, counsel for the Stern plaintiffs will complete. Well, what I want to know, my bottom line is, assuming AT&T did a no-no, something they shouldn't have done, and people were charged money for it, and they shouldn't have been charged. And, you know, people don't really look at their phone bill carefully. And they probably should, but there's so much stuff that goes through your life these days that you don't have much time for it. So, and then to come up with a settlement that somehow comes up with a small amount of money, $7, who's going to worry about that? Fill out something. And so if AT&T did something that was a no-no and took people's money, even in small amounts, then that money ought to go somewhere. If people don't come in who were victims and claim the money, then why should AT&T be allowed to keep it? Maybe it ought to go to the Treasury. Maybe it ought to go to National Public Radio, someplace like that. So two comments, Judge Gregersen, on that. First of all, you've articulated the class plaintiff's point of view in the litigation. AT&T vigorously disputed for eight and a half years its liability on those claims. AT&T asserted, and we believed we had good basis to assert, and certain rulings in the various courts supported us in this belief that we would have minimal, if any, liability at trial because there was not a nondisclosure issue at all. There's no entitlement in a class settlement for the class plaintiffs to recover. And that's one of the fallacies, I think, of the objector's arguments. This is a negotiated settlement. Class plaintiffs and class defendants, just like the parties in any other litigation, are entitled to negotiate a settlement, provided that they do so in a fair, non-collusive way and can withstand scrutiny under Rule 23E in producing a fair, reasonable, and adequate settlement. And that's exactly what happened here. The parties did negotiate a fair, reasonable, and adequate settlement. And it was a claims-made settlement, not a common fund settlement. So there's no extra money to go anywhere. And the $7 is not a small amount of money. That's the amount of money that the class plaintiffs were seeking to recover. They might have claimed that if they prevailed at trial, they might have gotten $9 or $11 or even at the maximum, according to the evidence in the record, $21. We were at $0 through a very heated negotiation after these over eight years of litigation. We settled on $7 on a claims-made basis with a very low threshold for claimants to assert that claim. We've talked a little bit already. So you're buying your peace, is what you're saying. We are buying our peace in a way that is proper. In a way that you hope isn't going to cost very much. Well, obviously, that's what made the settlement, is that the class plaintiffs expected the take rate would be very high because they thought that everyone had been deceived. We thought the take rate would be low because we were quite confident that we had made very complete disclosures of this fee. And that's what made the bargain. And the duty of this court, of course, is to review what Judge Schneider did in the district court on a clear abuse of discretion standard. The district court fulfilled its responsibility to independently look at the settlement, both the terms of the settlement and the fee order, and in its discretion granted the final approval and also granted the fees. Now, I'm not here to defend the fee order. I'm here to defend the final approval order. And under the facts of this case, those are severable. They weren't severable in Bluetooth, but as Bluetooth itself recognizes and cites this Court's Rodriguez decision, approval orders and fee orders can be severable. Here, I don't know that you need to get there, but if there are whatever issues there are with the fee order, they don't affect the approval order. And I don't think there are issues with either one of them. Judge Schneider was meticulous in going through the review of this settlement. She held not the normal two hearings. Normally, there's a preliminary approval hearing and a final approval hearing. She actually held three hearings. She held a preliminary approval hearing, a special hearing that was devoted just to the objector's issues, and then she held a lengthy final approval hearing. When you look at the record of those transcripts and you look at the final approval order, we invite the painstakingly case-specific review that in Staten, Judge Burson, you wrote in your majority opinion. We invite that review. That's what Judge Schneider did in the district court. She gave it a painstaking review, and you can go down the issues that the objectors have raised, from collusion to the substantiality of the benefit to the issues they've raised with the release to the issues they've raised with the clear sailing and reverter and to the issues they raised with the claim form. And on each and every one of those, you will find references in the final approval order, and you will find not just one or two, but multiple references on each of those issues in the transcripts. So we had a very careful judge here who fulfilled her independent duty. I guess this goes more to the fees. Go ahead. Out of curiosity, maybe, you say you're here to defend only the settlement order, not the fee order? Yes, they're two different things. What happens if by any chance the fee order were to be set aside? Judge Schneider asked that very question, Judge Reinhard, and the answer is that under the terms of the settlement, and this is one of the things that makes it so fair and reasonable to the class, is that no matter what amount the class council received as fees, this settlement goes forward. If they receive $10,000, the settlement goes forward. If they receive the full $5 million, the settlement goes forward. So there's no money taken out of the class's pockets to fund the fees. The $7 benefit on its own was unquestionably, I would submit, and I think Mr. Nutley told the panel that he's not really challenging the $7. Whatever amount were in such circumstance to be finally awarded, say it was five times as much as it now is, you would still be bound by that? No, Judge Reinhard. The settlement agreement provides that our maximum liability is $5.6 million in fees plus some amounts for costs. But the settlement agreement didn't, unlike in Staten, I believe, where there was an agreement to an amount that was tied to the settlement. Here, our settlement agreement merely said, and this is a quote of the settlement agreements in the excerpts of record, that class council may apply for fees. They may apply for incentive payments. We were very sensitive to this very issue in coming up with this settlement. It was a very well-thought-out settlement because, candidly, it was somewhat novel. You say may apply but can be awarded no more than $5 million. AT&T would be liable for no more than $5.6 million. Who else would be liable for the rest? They would receive no recovery for any extra amount. They agreed that their maximum recovery from AT&T would be this amount. They were satisfied with the right to apply for that maximum amount. But knowing that there was no floor, they could receive very little and the settlement would still go forward and they would be left without any recourse. So, unlike in Staten, it wasn't dependent on the amount of the claims, the amount of a fund, the amount of anything like that. That's correct, Judge Reinhard. Yes, it is. Objectors' counsel hasn't argued much on the specific grounds for the objection's substantiality of the claim form, the release, and the clear-sailing reverter. I'm happy to go through the excerpts of the record and point out where Judge Snyder affirmatively exercised her discretion, unlike the judge in Bluetooth. And Bluetooth, at its core, is a failure-to-exercise-discretion case. That's really what the Ninth Circuit was saying. We know she's a careful judge. Yes, and she was careful in this case, Judge Pragerson, and did everything she needed to do. She articulated her independent duty at the very beginning of the hearing and she followed through. The parties actually had submitted an agenda to her at the final approval hearing and she said, no, I'm doing this my way. She was not going to rubber-stamp this settlement and she didn't rubber-stamp it. As I understand it, the objection to the amount of the settlement or to the manner of settlement is not to the $7.00. It's also not to the manner in which class members were notified of the possibility of a claim. I didn't see anything about that. No objection to that. So it seems to be primarily about the requirement that they check these boxes under penalty of perjury. I think that they seem to be focused on the claim form, yes, and with respect to that, all I can do is reiterate that by the standard of claims made settlements, the bar that claimants had to jump over to complete that form and receive their $7.00 was very, very low. They simply had to attest that they were a subscriber during the relevant period and they had to answer three very general and somewhat vague questions, the wording of which was hotly negotiated during the mediation. So there's no barrier to claimants asserting their right to receive the $7.00. And there's no law in the Ninth Circuit or elsewhere, to my knowledge, that says that such questions are improper. To the contrary, claims made settlements are entered into and approved by district courts and circuit courts regularly. So there's nothing novel about our claim form here. In fact, I would submit that because there was no evidence of the number of UCC payments that had actually been made, no requirement for bills to be attached, no detailed information about the length of the service that they had received from AT&T, that the barriers here are actually low by claims made case standards, not high by claims made case standards. So it was a fair settlement, and I don't think that the claim form provides any basis for this court to say that Judge Snyder, having considered the claim form affirmatively and exercised her discretion, abused that discretion in approving it. How are these claim forms to be distributed? I'm sorry? How are the claim forms to be distributed? We had a very comprehensive notice program. The claims form were ultimately accessed via a website. That was the address of which was contained in the class notice, and also people could request a hard copy if they wanted to request a hard copy. So it was easy to get the claim form. How would they be notified? How would the respective claimants be notified? We had a phenomenally comprehensive notice program, Judge Pragerson. Again, that's not an issue on this appeal. I know, but I'm just curious. I want to see how the big boys do things. In this particular case, the ladies and gentlemen on our side of the courtroom agreed on a notice program that included direct notice to some $3 or $4 million current subscribers, who were also subscribers at the time, email notice to another almost 5 million former subscribers. You put it in with a phone bill. Yes. We also had email notice for those where we had email addresses or people who had electronic billing, and there were a number of those. We had an extensive social media campaign. We had newspaper advertisements. There was a press release which generated over 300 articles in national publications from the Wall Street Journal on down, and all of this is in the record. So that's the type of notice program that we had, Judge Pragerson, and the success of that notice program in reaching our class is also documented in the record. Were these forms that the claimants had to sign under penalty of perjury essentially that they would not have bought the program if they had known there was an extra 50 cents or so, whatever it is? $29. $29 that they would have not bought the A&T phone, they would have bought another phone if they had known there was $0.29 charge? $0.59, but yes. I thought it was $0.20. The average was $0.59. I was misled. The average was $0.59 a month. It varied somewhat, but the average was $0.59 a month. So the benefit is a full year of that payment. When we had a belief on the defense side of the underlying matters that there would be zero liability, and in fact we received some favorable orders from Judge Friedman in Alameda County where one of the cases was pending, and up in Washington State that supported us in our position there. I guess I'll just conclude and then let Mr. Johnson and Mr. Genach speak by talking a little bit about the take rate, because that's another one of the issues that the objectors have talked about and whether the district court needed to know the take rate. And I would submit that it would really set a – it would be contrary to the flexibility of Rule 23 and would be bad public policy in terms of requiring judges in this fact-specific analysis that we have to go through to approve class settlements to draw any sort of bright-line rule, particularly under the facts of this case, that the take rate had to be known. It did not have to be known. What Judge Snyder was properly looking at, and she articulates this clearly, is the substantiality of the $7 benefit. She focused on that, and then she focused on what she called the robustness of the notice program, because the class is a collection of individuals. So in a claims-made settlement, if the class members' due process rights are respected by giving them adequate notice and the benefit is adequate, then the benefit is substantial, and the district court has the basis to approve the settlement, regardless of whether all 36 million people claim the settlement or 10 million claim the settlement or fewer people claim the settlement. That issue was not material to whether the facts of this case. There may be other cases where it would be material, but under the facts of this case, it was not necessary for Judge Snyder to know that take rate information. Well, how would she know it anyway? You'd have to carry out the claims procedure before it had been approved. She would have had to have delayed the final approval or taken other steps. Yes, exactly. So there's that practical impediment, and not only to this settlement, but to claims-made settlements generally. The cost, and this isn't in the record, and I hesitate to go here, but what is in the record is that this was a very, very comprehensive notice program, and you can only imagine the cost of it. And to establish a rule that you'd have to potentially do that over again after reviewing a take rate that doesn't matter anyway is an impediment to class settlements that you just can't find in Rule 23E. This program was probably one of the biggest numbers. It was a large class. I went through this about, oh, 35 years ago, and we had a huge campaign. But in that matter, we had a specific fund. Of course, it came from the federal government, and we employed J. Walter Thompson. We had different auditors. I mean, it was a nationwide advertising program. And when all was said and done, because at that time the interest rates were high, I think we ended up in the fund with as much money as we started with. Then the big question is, what are we going to do with the money? Should we set up? It was there. So I turned it back to the Treasury of the United States. So in this case, we didn't have a fund, of course, but our case is similar to the one you're describing, Judge Ferguson, in that we had a nationwide notice program, and it sounds like it was an updated version of what took place in that case. But I don't want to cut to— Well, the time's up. Maybe you want to give your co-counsel. Thank you. It's interesting. Thank you. Thank you. You're doing a good job. Thank you. Good morning. May it please the Court. My name is Daniel Johnson, and I represent the plaintiffs' appellees. And I'll start by saying I will never wear a blue shirt in this courtroom again. Although your Honor seems to be wearing a nice color. No, I just remember in the early days, every lawyer that came into court would wear white shirts. Some still do. Yeah, some still do. And I used to get profuse apologies from those who had rushed in from the airport and didn't have a chance to change.  Thank you, Your Honor. I guess I would start from our perspective on the subjects being raised here today to point out that this case really is different than all of the cases that the objectors are relying on in many respects, but principally or primarily first, that how long it was litigated. Eight and a half years of litigation. Probably a thousand docket entries between the courts of appeal and the two superior courts. You know, if you take the amount of hours that were submitted as part of the Lodestar application and spread it over that time, it's probably about 100 hours per month on average. But those cases were all about exactly the same thing. They were about these UCC fees. Oh, that's right. The underlying cases were all about the universal connectivity charge. And the claim was essentially a nondisclosure claim, a failure to include that in the price or to alert people in advance that the price would be higher than advertised. And the litigation was somewhat on the class action issue and somewhat on the merits over the years. Oh, yeah. It was quite wide-ranging. We went up and down, for example, on arbitration issues, and we had many motions on affirmative defenses, preemption, and the like. But we also had many, many merits motions and several class certification motions and decertification motions. So Mr. Nutley, one of the issues that Your Honor spoke with Mr. Nutley about that I'd like to address is the record supporting our fee application because it was primarily a Lodestar analysis due to the nature of the settlement, which this court has often said is appropriate in such cases. And we felt the rule of law is that class counsel must submit adequate documentation to support their application. Ordinarily, in a non-settlement class, you do need to submit all the billing. I would think that is probably correct. I'm not sure I know a case that has said that. Certainly, it's a practice. Yes, right, exactly.  which was the dockets themselves from all these courts, as well as long, detailed summaries from counsel, each counsel, describing what we did in the cases over that eight and a half years of litigation was more than adequate. And it's within Judge Snyder's discretion under a prevailing law to decide whether that was insufficient for her. Objectors raised this issue vaguely at a hearing at one point, and she said, make your requests of counsel if that's what you want, and they didn't do it. She acknowledged at the final approval hearing that this issue, that these detailed daily time records were not before her, and she concluded in her discretion that the record was adequate. As I say, more than adequate, we think. If you take other cases, let's say, Statton v. Boeing, perhaps, is one where the amount of litigation that had occurred was, certainly in terms of time, was a lot shorter than in this case. Hanlon v. Chrysler, a very similar lodestar fee was approved by this court on appeal, and that case had been pending in court for barely over a year. This case was in litigation for so long that it's somewhat surprising to us that this is a case that objectors want to hold out as one where detailed time records must be submitted. Suppose it turned out that, I mean, you guys presumably, it's sort of like you're hiding the ball, but understandably, you guys presumably know what the actual take rate is. We don't know. It's not in the record, but it exists, and I assume you know. Suppose it turned out that the actual amount of money collected was $100,000. Would that matter to our judgment with regard to the fees? Well, I'm afraid it can't because under prevailing law in any case and in the way that Rule 23 operates, the purpose of Rule 23 principally or significantly is to enable very small individual claims to be brought. Otherwise, companies would never face that. Yes, but, I mean, in instances like this, my understanding is that the more usual way to do things is for the defendant to agree to put together a fund of $10 million, $20 million, some amount of money, and let's see if you're faced with $5 million or $6 million, whatever they were, with the usual 25%. It would be, say, a $30 million fund, and then if it wasn't claimed, as Judge Prager was saying, it would go somewhere else. That isn't what you did here. There may be good reasons for that, but does it matter that – would it matter if it turned out that the actual recovery was minuscule? It would be very disappointing, but it would not matter because, as I said, first of all, this Court has addressed that question in several cases directly, the six Mexican workers case and the fish shell case, perhaps. What question? Exactly. What question did they address? Whether the amount claimed from a settlement that was made available should be used to measure the success versus the amount that was made available. Okay. This Court has said more than once that it is the amount made available that must be used, and the reason for that is that settlement of class actions is encouraged, just like settlement in general is, and some cases cannot be settled but through this process. This case either would have – Well, why? We're not talking about the settlement for the individuals. We're talking about the settlement for the lawyers. And why can't it be settled in that manner? You say to the lawyers, look, if it turns out you're collecting $1,000, we're not going to give you $3 million. If it turns out you're collecting $30 million, then we'll give you $3 million. Why would that be improper? Well, it isn't the rule of law, and I think that you would have a great deal of – that would exert a lot of limitation on parties and district courts in getting these cases resolved. These cases that involve arguably $7 per plaintiff, there's probably no way to make the claim rate very high. And so that would probably prevent these cases from being brought. There are those kinds of cases that often lead to these Cypre resolutions where whatever isn't claimed goes somewhere else, the theory being that the defendants aren't the one that should benefit because they did, in fact, do whatever legal violation they did, even if there's no incentive by the members of the class to make the claim. Well, there certainly are a lot of ways that this case could have settled, and many of them might be ways I would prefer to have settled them. But the point is that parties may, within limits, settle their cases however they see fit, and the district court must review them for certain structural problems. And here, none of those structural problems exist. You're not reading our case law as saying that a district court couldn't have questioned this relationship. You're essentially saying it was an abuse of discretion not to. Well, I might say both, but I'll stick with the easier answer. Yes, that's certainly true. My question is only because you said cases couldn't settle if the lawyer's fee wasn't absolutely fixed rather than, in the end, being related to claims made. Well, I think, taking off from what Judge Berzon just said, that it isn't my argument that had Judge Snyder said, you know, I'm concerned about take rate in this case, and I want to know what that is, and then I'll look at your fee application, you know, I'm not claiming that that would have been an abuse of discretion. Or that it would have been any great difficulty for settlement. Well, I will say I don't know the take rate, and I don't know, you know, it wasn't available. In any event, you're saying it's not an abuse of discretion for her not to insist on that. That's right. And, you know, I think that's really where it comes down to, is where we begin with the standard of review. And, you know, this court has preserved district court discretion to review these settlements and decide whether they meet the standards that have been set out. And only reverse an approval where the agreement has convincing indications that attorneys, the class counsel's self-interest was placed ahead of the class's interests, and in fact influenced the outcome, and the district court was wrong in concluding otherwise. But could we say the class settlement is fine, but we have a problem with the attorney's settlement? Are those really two separate issues? They are, and that's in part because structurally we separated them, both in negotiations and in the settlement agreement itself. But you'd have to have a rule of law to send it back to the district judge to do differently. I mean, if you look at the five things that the Bluetooth court said the district court should have done and must now do, Judge Snyder did them all already. There are no legal standards in this court's jurisprudence that she didn't comply with. So that's the question, is what is the rule of law that the objectors would like to see, and how in this case was it not met? And I don't think there's an answer to that. There is no legal standard that this settlement is inconsistent with. Well, it could be a new legal standard. I did want to, if I could say very quickly, respond to one question, Your Honor, Judge Reinhart brought up about the judicial notice, the survey. That's in the record only by way of judicial notice, it's true. But the reason for that is that this claim form objection really wasn't raised in any meaningful sense until the day of the final approval hearing. That day there was a supplemental brief filed that Judge Snyder did consider, but of course we didn't respond to. At that time something about the claim form was raised for the first time, and of course we weren't able to respond. And so it's not in the record only for that reason. Thank you. Thank you. May it please the Court, and good afternoon. My name is J. Paul Janak. My firm is Eris O'Sullivan Janak. I'm also one of the class counsel in this case. Mr. Rice and Mr. Johnson have made very thorough presentations tonight, and I won't repeat what they said. I just have two quick points that I would like to make to the panel before we close on our side of this. The first is that I think it's important to note the fact that this was a case where the certification was done at the same time of the settlement. And whereas in some cases that raises a red flag for the Court to look at, in this case I think it's significant because we do not have objectors who were part of the class for a long period of time because there was a class certification early on in the case, and then at the end of the case when the case is settled, the objectors are in the position of saying, hey, I never would have agreed to be part of this class if I knew this is what the settlement was going to be. Here you have objectors who had a full opportunity to opt out, who actually knew what the settlement was going to be, had a chance to opt out. If they didn't think $7 was fair value, if they did not think they could comply with the claim form, these objectors, including the Lynch objector here today, had the opportunity to opt out. They could pursue their own case against AT&T via arbitration or otherwise. That's totally unrealistic. I mean, that wasn't going to happen. Instead, what they're doing as class members is saying, you guys were representing me and you could have done better. It doesn't seem like a very strong point you're making. Well, I think it's a point worth considering. And on the issue of arbitration, I think that's an issue that plays into this as well. At the time the settlement was being negotiated, we had all of us hanging over our head the Concepcion case. We didn't know what the ruling was going to be, and that certainly played into the dynamics. Was arbitration clause in these contracts, or some of them, or all of them? Yes, these are telecommunications. All of them, some of them? For the class plaintiffs, certainly for Ms. Stern, absolutely. I'm sorry, just the class plaintiffs had the arbitration agreements? Well, presumably all of the absent class members would have the arbitration agreement as well. Class members did have them? Yes. I mean, the class representatives had them. Class representatives did. And obviously now we know what the result of Concepcion is. So if this matter is remanded down to the district court for further proceedings, or if the court fails to approve of this settlement, I think it's very, very likely that AT&T will go into court and move to compel individual arbitration. And as we all know, post-Concepcion, it's a very strong likelihood that that motion will be granted. The arbitration provisions provide for no class action arbitration? That's correct. We actually, in a related case that actually has the same name, which is Stern, we actually litigated that issue. And there's actually a Westlaw, quote, unquote, published decision on that particular issue. So the settlement that was achieved in this case, I think, is an excellent settlement for the class. But more than that, it's the best possible settlement for the class. Because, again, if the settlement is not approved with Concepcion out there, there's going to be a motion to compel individual arbitration. There's not going to be another settlement for these class members in this case. Unless the panel has any questions for me, I will submit. Thank you very much. Thank you. I was wondering about Concepcion earlier. What is your answer to that? My answer is that this didn't really come up much below, and so I'm not sure how much evidence is on the record regarding the terms or the scope of the arbitration agreements, whether they covered all the class, half the class, some of the class. What if it's remanded? Which is why I'm not sure what the effect would be of a remand. There's waiver issues, I'm sure. It has to be true that somewhere on these massive dockets, the actual original sign-up agreements must be, because that's what the whole issue was in the case. Correct. We can find out. You can find out. We can find out. Yeah, if you can find it, but does it apply? Is it the same agreement that all the class members had? Was it the one pending during the entirety of the class period? The likelihood is yes. Possibly. The likelihood is that it says what they say it says, and the likelihood is that they didn't just write a special one for the class representatives. Oh, I'm sure that's true, Judge Berzon. But it may have changed over time is what I mean, possibly. There may be waiver issues as to whether AT&T can now enforce it. I don't know. This wasn't an issue that was litigated very much. I would like to say, Judge Berzon, the answer to that there is a case, in fact, that it's a Trotsky case, and I don't have the full site in front of me, that does say that it is no answer to say that people could opt out of a case. That is always true in an opt-out case to say that, well, if they didn't like the settlement, they could have opted out is, as you said, completely unrealistic and not. That's what Trotsky tried to do. It's not quite that old. That's been the law for a while. We raised the issues about the claim form and the requirements on class members, in fact, a couple of days before the hearing in a supplemental brief, which the plaintiffs actually had time to move to strike. So they were definitely aware of these issues before the hearing, maybe not long before the hearing, but they were certainly aware of those. It was unsuccessful, by the way. The judge did consider that objection. It is absolutely true that Judge Snyder is an extremely experienced judge. I've been before her myself in class actions and in objections. In this case, I think she just missed it a little in an important way. At pages 8 to 9 of our reply brief, we point out that Judge Snyder, and mainly at page 9, Judge Snyder believed that everybody who was getting released in this case would be entitled to money, meaning that the settlement is valued at $250 million or thereabouts. That, as we pointed out, is just not right. She did not believe that. There was extensive discussion. I read those hearings about the take rates and so on. She did not believe that. Well, I don't think she believed that everybody would claim. I think that's certainly not. No, she would never believe that. But she believed that everybody was entitled, which is not exactly true, because you could be a class member subject to release, send in your claim form, and maybe you've checked the box that says, no, I don't know, no, I don't know. You check one of the boxes, no. And they say, well, you're not qualified. Your claims are certainly released. You're still part of the class, but you're not entitled to your $7. So when the court says, well, if there's X number of class members times $7, that's really the potential value. Well, it's a potential value, but it's a very, very, very attenuated. Not only would everybody have to claim, but everybody would also have to be qualified. So there is a disconnect there. And it's absolutely true. Let me make one more clarification about our position. Mr. Rice suggested that it would be a bad rule for district courts to have to compare the take rate in every case in order to approve the settlement. He's absolutely right. We would never argue for a rule that would hamstring district courts, because as Mr. Rice points out, if you have this claims process and this notice process, these are oftentimes exceedingly expensive. It would be a silly rule to require district courts to throw it all out if there was a problem. That said, this is a case in which the claims rate is never to be disclosed. There is no provision to disclose it, even after the litigation is over. I think that there is a good reason to talk about disclosing claims rates as they are going, even before final approval. If a judge is aware that the claims rate is unexpectedly low, maybe it's a problem with notice, maybe there's something that can be done about it, the district court can step in and correct it. Failing that, I wouldn't say that's always required or that that's a categorical rule, but it is something that district courts might avail themselves of. Similarly, in a case like this where it is difficult to assess what the real value of the settlement is, for the purpose of attorney's fees, it also might be very useful, and in a case where there's no other information, it might be critical. Let me ask you to get to the heart of this. What is the abuse of discretion in the settlement fee? Not the fees, the settlement itself, as opposed to the attorney's fees. What is the abuse of discretion? What was the district court required to do or should have done that it didn't do? I think with respect to the settlement itself, the court should have inquired more deeply into why the qualifications, why there had to be these boxes to check under penalty of perjury. So you're talking about the form? Well, it's not just the form. I mean, these are embodied in the settlement. It's not that we don't like the way the form was set up. These are intrinsic to the settlement. You are a class member, but you are not entitled to money unless you meet these. So it's the form you object to, the requirements that are set forth in the form. Correct. And those requirements, we say, had no basis. There was no real rational basis to impose them. I assume the basis was that under at least some of the applicable state laws, perhaps most of them, there had to be some kind of reliance. Was that the notion? I think that must be the notion. Okay. So why is there no rational basis? Well, because under some of the more, for example, the UCL, the one that – Well, you have to do it one way or the other way, and they chose to do it this way. Right. And I think if they do decide to do that, I think the court should cast a very critical eye because instead of saying, here, we're going to pay you regardless, we're trying to parse through this class member by class member, you're going to end up with a much – Do you have any reason at all to actually believe that somebody who was going to otherwise send in a piece of paper to get $7 wouldn't check out these two boxes? I do. I mean, I think that the notion that people are going to send in a piece of paper to get $7 is a questionable premise. But the notion that if they're going to do that, they're not going to – When it appears that most people did, in fact, not see this because it wasn't there, and most people could say that how much the cost was mattered to me without – if they don't have to say it, and I wouldn't have done it otherwise, I don't see why it would make a difference. But bearing in mind that this is a – this wasn't just AT&T's tax that they had to impose. If you went across the street, you'd encounter the same tax. Now, you may be described differently. You may not be as misled, whatever. But if it made a difference to you and you said, well, then I'm not going to deal with AT&T, you'd go across the street and encounter the same tax. My understanding is the problem was that it wasn't a tax. At least that's the argument, that it wasn't a tax, that it wasn't on top of the bill. It should have been part of the bill. It should have been part of the cost. Yes, and frankly, I think that it's not entirely crystal clear to me what the central claim. It seems to vary between being a tax and not being described correctly as a tax and being passed on to the customer without being correctly described. Whatever it is, I think, Judge Reinhart, the answer to your question is, what was the abuse of discretion in the settlement? We don't think that the judge asked enough questions as to why there were these requirements. The implication is that perhaps the parties decided that what they wanted to do was to come up with – as they said, negotiated hotly for a process that wasn't necessarily going to generate that much money in claims. On that, whether or not the judge uses the claims rate to look at the fees or not, the notion that in a public adjudication involving millions and millions of people where it's being essentially paid for by taxpayer money, we are never, ever going to know how many people actually claimed in this case is, I think, a little bit hard to swallow because – So if the district court had the opportunity to amend the judgment and said, you'll disclose at the end how many people claimed, that would take care of that? That would go a long way, I think. That wouldn't necessarily – and I think, to be fair to everybody and to the other side, it's more of an issue of public policy and more of judicial administration than a problem specifically with this – That hasn't been the rule up to now. I think that's right. So that we would have to say that you did not abuse your discretion, but as a matter of policy, it would be a good idea for courts to do that. That's right, as to disclosing it at the end of the day. I would say that the court abused its discretion in not – as far as the attorney's fee goes and the take rate. I think the take rate should have been used to determine the fees, not as a categorical matter of policy for all cases like this, but because there was not enough information to determine what the real benefit to the class was. So, in other words, if the parties – and they're right. The parties are correct. You can structure the settlement however you like. What we're saying is if you structure the settlement so that you can't really tell how much the benefit is really going to be at the end of the day to the class, how many people are really going to care enough – So you're now moving from the settlement to the attorney's fees. Correct. Yeah, I meant to move to the attorney's fees. And in that order, what you'd accomplish is to reduce the attorney's fees and transfer that amount to AT&T. That's right. Okay. It wouldn't and couldn't go back to the law. That would not help your clients much. It wouldn't help the class, but it helps the administration of justice. These cases should be done right. They're done openly. They should be done correctly where the public says, I understand this. This makes sense. We can support class actions because we know what they do. And attorneys going forward will say to – when they're negotiating these settlements, they'll say to their opponent, listen, I can't do it this way because if I do it this way, I'm liable to lose my fee, as we learned from the AT&T case. And they won't do as bad a settlement. I think that's the issue. I think the notion that what's really important here is for them to bring these cases, even if class members never claim, they say it's important for us to still bring these cases even in small amounts. That's true. And yet, if no class member ever claims, and all the case ever amounts to is a transfer of money from the defendant to the plaintiff's lawyers, what has been accomplished? Well, you've accomplished the fact that they won't do this again, nor will other people do it. Won't they, Judge Reinhart? If I manage to limit my – And it increases the gross national product. The more we exchange money. But, I mean, the problem – there's something circular about saying the reason why we do these class actions for very small claims is that they have to be aggregated or else people aren't going to be able to bring them. Well, they're by their very nature a very small claim. And because they're very small claims, some people, many people perhaps aren't going to be bothered to go get their money even when they don't have to do much to get it. And there's nothing you can do about that. I mean, other than just, you know, hand out the money without having to send in anything, which in this sense, as I gather, would be fairly difficult to do because it was years later. Even finding them would be difficult. That's right. Or you can have a requirement that they have to arbitrate, in which case there is no further justice like that. Not group justice in that regard. Well, not individual. Nobody's going to get anything. And when you have to arbitrate, the company can just continue to do what it did. And they don't have to pay anybody anything. In this specific case, they stopped the practice long ago, which leads to the other point that there is no injunction here or other relief. But why did they stop it long ago? I don't know. Probably because they were sued for a lot of money. I think the decision predated the suit. And I think it might have had to do with the new federal law that came in, but I don't know. You'd have to ask AT&T that. Well, it's good you're here to argue for public policy. Thank you, Your Honor. All right. That's it. See you later. All right. Go ahead. Go ahead. Go ahead. This court is adjourned. Thank you.
judges: Pregerson, Reinhardt, Berzon